UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KURT ANGELONE,

                              Plaintiff,

        v.

DR. MICHAEL FURST, AIJAZ
KHURSID, LOUIE FIGUEROA,
JOHNNY WU, RUSSELL AMARU, and
ANDRE ROSSI,

                              Defendants.

No. C07-5538 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  November 18, 2011**

        Before the Court is Defendant Michael Furst's Motion for Summary Judgment.  ECF No.

174.[1]  Plaintiff Kurt Angelone filed this lawsuit on September 28, 2007 alleging:  (1) inadequate

medical treatment; (2) violation of privacy rights; and, (3) retaliation.  ECF No. 6 at 51-52.  On

December 2, 2008, this Court granted Dr. Furst's motion for summary judgment and dismissed

all claims against him.  ECF No. 121.  On September 9, 2010, the Ninth Circuit Court of Appeals

affirmed this Court's decision in part, vacated in part, and remanded.  ECF No. 163.  The Court

of Appeals affirmed the summary judgment dismissal of Mr. Angelone's claims of inadequate

medical treatment and violation of privacy rights, but remanded for consideration in the first

instance of the retaliation claim:

---

[1] Plaintiff's claims against Defendants Louie Figueroa, Johnny Wu, Russell Amaru, and Andre Rossii were
dismissed with prejudice and his claims against Defendant Khursid were dismissed without prejudice for failure to
serve the complaint.  ECF Nos. 148 and 151.

REPORT AND RECOMMENDATION - 1

In his verified complaint and opposition, Angelone alleged that Furst threatened to, and did, lie to Angelone's medical provider about Angelone being a benzodiazepines seeker, in retaliation for Angelone exercising his First Amendment rights, thereby causing Angelone to be taken off Valium. Viewed in the light most favorable to Angelone, this could raise a genuine issue of material fact regarding Furst's intent that Angelone be taken off Valium. *See Bruce v. Ylst,* 351 F.3d 1283, 1288-89 (9th Cir. 2003) (summary judgment not appropriate where inmate raised a genuine issue as to whether the stated penological goal for the alleged retaliatory act was not legitimate).

ECF No. 163 at 2-3.

Having reviewed the motion, opposition and supporting declarations and balance of the record, the Court recommends that Defendant Michael Furst's motion for summary judgment on Mr. Angelone's retaliation claim be denied.

## STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023-24 (9th Cir. 2004). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth

REPORT AND RECOMMENDATION - 2

specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1029 (9th Cir. 2001). This is true even when a party appears *pro se*. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

## EVIDENTIARY ISSUES

### A.    Plaintiff's Medical Records

Portions of Mr. Angelone's medical records are attached to the affidavit of counsel for Mr. Furst as "true and correct copies." ECF No. 175 (Declaration of A. Clarke Johnson), Exhs. 1-53. Mr. Angelone objects to Dr. Furst's exhibits as hearsay. ECF No. 181, p. 2. Dr. Furst submits his own declaration stating that he has reviewed Mr. Angelone's medical records and provides summaries of certain of those records. ECF No. 176 (Declaration of Michael Furst, M.D.)

Medical records are hearsay, but may be admissible under the business records exception to the hearsay rule. *See, e.g.,* Fed. R. Evid. 803(6); *United States v. Hall*, 419 F.3d 980, 987 (9th Cir. 2005) (medical records are "classic exceptions to the hearsay rule"). That exception renders admissible records of "acts, events, conditions, opinions, or diagnoses, made at or near the time by … a person with knowledge," but only if such records are "kept in the course of a regularly conducted business activity, and if it was a regular practice of that business activity to make a memorandum, report, record, or data compilation." Fed. R. Evid. 803(6). Facts supporting admissibility must be supplied "by the testimony of the custodian or other qualified witness or by certification" that complies with Fed. R. Evid. 902. Rule 56(c)(4) states that an affidavit or declaration used to "support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

In his declaration, Mr. Johnson states merely that the documents listed therein and attached as exhibits (*i.e.,* portions of treatment notes taken from Mr. Angelone's medical records) are: "true and correct copies." Mr. Johnson does not have knowledge of "acts, events, conditions, opinions, or diagnoses, made at or near the time" of the medical records and therefore, this evidence is not properly before the Court. However, to the extent Dr. Furst reviewed and relied on various medical records and references them in his declaration, the Court may consider that evidence. *See,* ECF No. 176.

**B.     Declaration of Dr. Csaba Hegryvary**

Dr. Furst also relies on the declaration of Dr. Csaba Hegryvary. ECF No. 177 (Declaration of Dr. Csaba Hegryvary). Dr. Hegryvary is a psychiatrist who was hired by Dr. Furst's counsel to "evaluate the appropriateness of the care provided to this patient by Michael

REPORT AND RECOMMENDATION - 4

Furst, M.D., with particular emphasis on his role in this patient's care during September 2006." *Id.* (Hegryvary Decl.) Dr. Hegryvary concludes that the Valium prescription was medically contra-indicated, that baclofen was a safe substitute, that Mr. Angelone suffered no harm from the discontinuance of Valium, and that Dr. Furst acted in a medically appropriate manner in advising Mr. Figueroa of Mr. Angelone's history and the inappropriateness of prescribing benzodiazepines such as Valium. *Id.* at 4-5.

Mr. Angelone argues that Dr. Hegryvary is not qualified to testify as to Dr. Furst's retaliatory intent. ECF No. 181, p. 11. Mr. Angelone is correct but his objection goes to the relevance of Dr. Hegryvary's testimony and not its admissibility. Moreover, Dr. Hegryvary's testimony may be relevant to the issue of whether discontinuance of Mr. Angelone's medication was an adverse action. *See London v. Williams,* 2009 WL 567883 (9th Cir. March 6, 2009) (*unpublished opinion*) (affirming summary judgment in favor of medical providers because prisoner did not show that denial of his request for medication that was not medically warranted was an adverse action).[2]

### STATEMENT OF FACTS

**A.** **Summary of Mr. Angelone's Care by Primary Care Provider**

Louis Figueroa was Mr. Angelone's primary care provider when Mr. Angelone was transferred to Stafford Creek Corrections Center (SCCC) in September of 2005. ECF No. 103-2 (Declaration of Louis Figueroa) at ¶ 3. Mr. Figueroa is a Physician's Assistant Certified (PA-C) employed by the DOC. As part of his duties, he practices medicine under the supervision of a preceptor medical doctor. *Id.* (Decl. of Figueroa) at ¶ 2.

---

[2] The Court may cite unpublished Ninth Circuit opinions issued on or after January 1, 2007. *See* U.S. Ct. App. 9th Cir. Rule 36-3; Fed. R. App. P. 32.1(a).

REPORT AND RECOMMENDATION - 5

In September of 2005, Mr. Angelone complained of severe headaches for which he believed the steroid Prednisone provided the only relief. *Id.* (Decl. of Figueroa), ¶ 3. According to Mr. Figueroa, however, Prednisone is not a painkiller, it is not normally used to treat headaches, and it is an anti-inflammatory that can have harmful side effects if used long term. *Id.* Mr. Figueroa's review of Mr. Angelone's medical records reflects that Mr. Angelone was prescribed Prednisone in a medral pack while he was incarcerated in South Dakota. A medral pack is a rapidly descending dosage of Prednisone to treat an acute inflammation and the Prednisone is discontinued at the end of the pack. MRIs of Mr. Angelone's brain and cervical spine, taken while he was incarcerated in South Dakota, were normal. *Id.*, ¶ 4.

Mr. Angelone had been taking Prednisone since his incarceration in Washington beginning in 2002, although there were several attempts to taper him off of it prior to his arrival at SCCC. Another MRI of his brain taken on November 12, 2003 was normal. When Mr. Angelone arrived at SCCC, he was taking the maximum dose of Prenisone of 60 mg. In January 2006, Mr. Figueroa tried to taper him off the steroid by decreasing the dose by 10 mg per day until it was 30 mg per day. Not only did Mr. Angelone complain of increased headaches as a result of this tapering, his blood pressure also began to go up. ECF No. 103-2 (Figueroa Decl.) at ¶ 5.

Mr. Figueroa discussed the case with his preceptor doctor, Dr. Aijaz Khurshid, who suggested a neurologist consult. Mr. Figueroa made the request to DOC's Care Review Committee (CRC), and the request was approved. ECF No. 103-2 (Figueroa Decl.) at ¶ 6. On July 20, 2006, Mr. Angelone saw Dr. Leo Kesting, a neurologist in Olympia, Washington. Dr. Kesting diagnosed probable tension headaches and recommended trying a muscle relaxant, Soma, while trying to taper Mr. Angelone off of Prednisone as Mr. Angelone had found Soma

REPORT AND RECOMMENDATION - 6

effective in the past. However, because Soma is a very abused muscle relaxant, it is not on the DOC formulary. Nevertheless, Mr. Figueroa put in a non-formulary request (NFR) to the CRC to allow Mr. Angelone to be given Soma. The request was denied. ECF No. 103-2 (Figueroa Decl.) at ¶ 7. Mr. Figueroa decided to try another muscle relaxant, Valium, which is on the DOC formulary. However, Dr. Michael Furst told Mr. Figueroa that Mr. Angelone "was a benzodiazepines seeker and Valium is in that class of drugs." Therefore, Mr. Figuera discontinued Valium and tried Mr. Angelone on Baclofen, another muscle relaxant, as well as 25 mg of Prednisone. ECF No. 103-2 (Figueroa Decl.) at ¶ 8.

Dr. Khurshid saw Mr. Angelone on December 8, 2006 and agreed to an increase of his dosage of Prednisone to 30 mg and then later to 40 mg. This is what Mr. Angelone was taking when he was transferred to the Washington Corrections Center (WCC) on March 14, 2007. *Id.* at ¶ 9.

**B.  Grievances Filed Against Dr. Furst**

Michael Furst is a board certified psychiatrist who has been providing contract psychiatric treatment services to DOC inmates since March 2002. ECF No. 85 (Declaration of Michael Furst) at 1. He first met with Mr. Angelone on October 13, 2005 in the "no contact rooms" at the SCCC intensive management unit (IMU). ECF No. 6-2 at 13 (Grievance, Level 1, Log No. 0524535). *Id.* Following the visit, Mr. Angelone filed the following grievances:

**1.  First Grievance – Privacy Issues**

Mr. Angelone filed a grievance on October 20, 2005, seven days following his first visit with Dr. Furst. Mr. Angelone claimed that his privacy and patient confidentiality rights had been violated because other inmates could overhear his discussion with Dr. Furst about his mental health problems. *Id.* The no contact rooms are partitioned by glass and contained

"communication devices" that allowed "two-way conversations." *Id.* According to Mr. Angelone, this method of communication allowed him to overhear "the complete dialogue between" Dr. Furst and another inmate sitting "three rooms away," and forced him to choose between his patient confidentiality or being treated for his mental health problems. *Id.* Mr. Angelone states that he shared his concerns about the lack of privacy during his first visit with Dr. Furst and Dr. Furst told him that the set-up currently in place had been like that "since he [Dr. Furst] started seeing inmates in F-unit and that no one has complained before". ECF No. 181-1 (Angelone Decl.) at 2.

In his grievance, Mr. Angelone requested that "any and all future appointments with the psychiatrist be at a place arranged other than those [above-noted] rooms to secure and maintain confidentiality." *Id.* The grievance coordinator responded, in relevant part:

> . . . The facility/Unit has limited access to the psychiatrist and he asks that he not have to wait to see offenders so that his time is maximized. If you have confidential nonroutine issues to discuss, you may request of the custody staff and/or psychiatrist to be seen in the hearings room.

*Id.* Mr. Angelone appealed, again requesting that "any and all visits, interviews, appointments, consultations, or otherwise with Dr. Furst be in confidence as there is really no such thing as routine discussions that doesn't [sic] require confidentiality." ECF No. 6-2 at 14 (Appeal to Level II, No. 0524535). The response to Mr. Angelone's appeal reads in relevant part:

> . . . You have made a very valid point and we will ensure your confidentiality when meeting with any health care providers. To that end, our engineering staff will begin to look at physical plant issues that can be addressed. Thank you for bringing this to our attention.

*Id.*

### 2. Second Grievance – Privacy and Tort Claim Grievance

On November 3, 2006, Mr. Angelone filed another grievance against Dr. Furst:

REPORT AND RECOMMENDATION - 8

Dr. Furst prison psychiatrist has and continues to as of 10/13/05 **up until my last appointment 9/28/06** violated my state and federal rights to patent – confidentiality laws. He did this knowingly and will-fully [sic] and with a total disregard to his duties to a patient's interest to privacy. Despite my requests for him to do so and the grievances I submitted ruling in my favor see ID #0524535, level 1 and 2 he not only didn't care, he threatened me each time that if I keep asking for privacy he will continue to deny me the medications Ritalin and adderal for my ADHD. He also knows I also suffer from several other mental disorders. **At my last appointment I told him I was going to file a tort claim on him. He became angry and said he saw where PA Figueroa prescribed Valium, I'm going to make sure you get off it by telling Figueroa and medical that I was a diazepam seeker. The medication was discontinued and because of his retaliating against me I continue to suffer from excruciating head pain**. He also has violated my 1st and 8th amendment rights to the U.S. Const. because of his actions. I continue to also suffer from emotional injury and makes my other conditions worse causing new medical and mental problems.

SUGGESTED REMEDY: I want $100,000 dollars to be seen by a psychiatrist other than Furst immediately to be seen by a medical doctor to see the outside neurologist again for my head immediately. To be put back on valium the PA prescribed.

ECF No. 6-2 at 15 (Grievance, Level I, Log No. 0623466) (emphasis added); ECF No. 181-2 (Angelone Decl.), Exh. 1 at 2 (CM/ECF pagination).

On November 8, 2006, the grievance coordinator responded:

Grievance Coordinator Dahne has investigated your complaint by reviewing your level 1 and interviewing Dr. M. Furst and it is concluded that IMU has replaced several of the speaker systems with telephone systems. This increased confidentiality immensely and there are plans to replace the remainder in the near future. Dr. Furst is also willing to take anyone who has confidentiality concerns as his last client which additionally enhances confidentiality although it is your responsibility to convey this concern to him.

ECF No. 6-2 at 15 (Grievance, Level I, Log No. 0623466); ECF No. 181-2 (Angelone Dec.), Exh. 1 at 2.

On November 27, 2006, Mr. Angelone appealed Grievance No. 0623466 to Level II. He received the following response:

CS Bruner investigated your grievance and Associate Superintendent Glebe reviewed the response. Your initial complaint and grievance were reviewed, and you were interviewed. CS Bruner interviewed CUS Dahne who has confirmed that a new phone system and speaker system has been replaced in the no contact

visit rooms where Offenders meet with Dr. Furst and that arrangements have been made for you to meet with Dr. Furst last to ensure confidentiality. Dr. Furst also stated that the decision to take you off Valium was made by himself and Dr. Kurshid and that unfortunately the medications prescribed by the Neurologist is not approved for Offenders in Prisons and that the medications you are currently prescribed are a good substitute.

ECF No. 6-2 at 16 (Grievance, Level II, Log No. 0623466).

Mr. Angelone received the following response to his Level III appeal of Grievance No. 0623466:

. . . The institution has installed telephones in the no contact visit rooms to address the concern of confidentiality and Dr. Furst has offered to meet with you lastly to ensure that no other inmates are in the area to overhear any conversation. While the installation of telephones and the change in meeting time have occurred to ensure more confidentiality exists for the meetings between Dr. Furst and you, you contend that the changes are insufficient. I do not see evidence that confidentiality is compromised with the implementation of these actions . . .

ECF No. 93-3 (Angelone Decl.), Exh. 4 at 8.

## C.    Termination of Valium Prescription

As noted above, Dr. Kesting, the neurologist who saw Mr. Angelone on July 20, 2006, diagnosed Mr. Angelone with tension headaches and recommended that he be treated with Soma, a muscle relaxant. That medication is not on the DOC formulary and Mr. Figueroa's non-formulary request for the medication was denied. Thus, Mr. Figueroa decided to try another muscle relaxant, Valium, which is on the DOC formulary. ECF No. 103 (Figueroa Decl.), Exh. 1, ¶¶ 7, 8 and Attach. G at 21 (CM/ECF numbering).

On September 28, 2006, Mr. Angelone returned to Dr. Furst. Dr. Furst noted the following in Mr. Angelone's medical chart:

**Patient was started on Valium 15-mg daily** by his primary care provider. Patient tells me that he continues to experience "reprisals" from custody staff for having filed harassment complaints against them. Patient is requesting transfer from this institution and feels that several of his infractions have been fabricated.

REPORT AND RECOMMENDATION - 10

**...**
Supportive psychotherapy and psychoeducation were provided. **I told him that I would discuss the benzodiazepines with his medical provider. Patient has a history of seeking these medications in the past and I have studiously avoided prescribing him benzodiazepines** during the last year or so. I do not feel this patient has been particularly reliable and he has remained fairly manipulative in his presentation. He has now been taking buproprion SR 400-mg for more than one year and I told him that if his mood remains fairly stable, I would like to initiate a taper with a close monitoring of his mood. Patient became somewhat caustic at this point and I decided to terminate our meeting.

Medical staff later provided me a copy of the note the patient wrote to his medical provider which states, "Dr. Furst seen (sic) me today and was hostile about you giving me Valium and said 'wait till I talk to him you won't be on it any longer!!'...I responded by letting him know I had never had any Valium in my life or like meds...I told him I've been on Klonopin before...he has been prejudice [sic] against me since day one...he also said now I'm taking you off Wellbutrin – if you don't like that file a lawsuit. Then he rushed out the door and said now your [sic] not going to get anything for your headaches I will see to that!!!" I am quoting from this kite to provide some examples of patient's characterological distortions of reality.

ECF No. 176 at 3 (citing records attached to ECF No. 175, Exh. 37 (Johnson Decl.)).

In responding to requests for admission, Dr. Furst stated that he "did not intimidate Mr. Figueroa, rather, [he] expressed [his] concern to [Mr. Figueroa] that plaintiff was receiving an unusual treatment with potential serious side effects for his alleged headaches and that Mr. Figueroa might consider requesting a neurology consultation." ECF No. 95, Exh. 1 (Responses to Requests for Admission at 6, ¶ 23.

In his responses to discovery requests, Mr. Figueroa explained that he "prescribed Valium to Plaintiff on or about September 26, 2006, because Valium, like Soma, is a muscle relaxant and may work as well in relieving Plaintiff's headache pain." ECF No. 93-3, Exh. 5 (Responses to Requests for Admission at 10, ¶ 19). Mr. Figueroa stated further that "in or around September of 2006 [he] had a conversation with Defendant Furst where he mentioned Plaintiff was a diazepam seeker." *Id.* at ¶ 20. Mr. Figueroa also admitted that "per Defendant

REPORT AND RECOMMENDATION - 11

Furst's order, [he] could no longer prescribe Valium for Plaintiff on or around September 28, 2006," and that "a conflict may have arisen between Defendant Furst and [himself] had [he] continued prescribing Valium for Plaintiff after Defendant Furst ordered [him] to discontinue prescribing it to Plaintiff…." *Id.*, ¶¶ 22, 24. at ECF No. 93-3, Exh. 5 (Responses to Requests for Admission at 10-11, ¶¶ 20, 22-23).

**D.      Stated Reasons for Discontinuing Valium Prescription**

Dr. Furst states that his review of Mr. Angelone's chart revealed prior psychiatric diagnoses of severe mixed personality disorder with paranoid, narcissistic, antisocial and borderline features; undifferentiated somatoform disorder; intermittent explosive disorder; and malingering. ECF No. 176 (Furst Decl.) at 1. Treatment notes also reflected that although Mr. Angelone had not recently met the diagnostic criteria for either panic disorder or PTSD, he had requested treatment with benzodiazepines. The treatment notes also reflect Mr. Angelone's report of previous poor responses to selective serotonin reuptake inhibitor antidepressants. *Id.* at 1-2. Dr. Furst thought that Mr. Angelone was a questionably reliable historian and that it was somewhat difficult to determine whether Mr. Angelone's self-report was fully genuine. Mr. Angelone alleged he was suffering from residual symptoms of ADHD yet demonstrated no marked psychomotor restlessness, impulsivity or distractibility. *Id.* at 2.

According to Dr. Furst, Mr. Angelone's medical records "clearly document that Mr. Angelone has a long history of seeking medications including narcotics and benzodiazepines. These records document the opinions of Mr. Angelone's previous providers that chronic use of narcotics and benzodiazepines should be avoided." Dr. Furst cites to the following records, which are attached to Mr. Johnson's Declaration (ECF No. 175):

REPORT AND RECOMMENDATION - 12

a)      Eugene Regier, M.D. notes on 6/21/2001, "Many of his visits here to the health services have been for the purpose of requesting pain medications …Assessment…Drug Seeking."

b)      Ronald Fleck, M.D. notes on 1/17/2003, "He seemed to be mostly concerned about getting back on the Klonopin today or some type of narcotic…"

c)      Mr. Hayter, PA-C notes on 6/26/2003, "Discussed and explained going on Klonopin or Xanax probably not indicated as there are better options…[And Mr. Angelone stating] 'I can't take anything but the Valium type drugs. The others all screw me up.'"

d)      Mr. Hayter, PA-C notes on 9/4/2003, "Daily we explain that we won't put him on narcotics – but any other option (accept [sic] Neurontin or muscle relaxers) is refused."

e)      R. Bednarczyk, M.D. notes on 8/25/2004, "Wants Klonopin and narcotic pain relievers" and a note of 1/5/2004 states, "Obvious option is narcotics and I do not feel that opiates are warranted in this patient as I feel that he will overly use them and be overly reliant on them and continue to demand more of them."

ECF No. 176 at 2.

In his declaration, Dr. Furst states that when he learned on September 28, 2006 that Mr. Figueroa prescribed a benzodiazepine to Mr. Angelone, Dr. Furst believed that it was his responsibility to discuss his concerns with Mr. Figueroa. ECF No. 176 (Furst Decl.) at 3. According to Dr. Furst, his goal to avoid benzodiazepines and use similar medications with fewer risks had absolutely nothing to do with Mr. Angelone expressing concerns about his privacy rights. *Id.* (Furst Decl.) at 3-4. In fact, Dr. Furst agreed that some of Mr. Angelone's privacy concerns were valid and that he offered to meet with Plaintiff last so that no other inmates could overhear their conversations. *Id.* (Furst Decl.) at 4; ECF No. 93-3 (Angelone Decl.), Exh. 4 at 8.

REPORT AND RECOMMENDATION - 13

According to Dr. Csaba Hegyvary, a psychiatrist hired by Dr. Furst's counsel to review Mr. Angelone's medical records, Mr. Angelone's medical records contain multiple references to concerns about avoiding benzodiazepines:

> The medical records of Mr. Angelone indicate he has a history of seeking specific drugs and is often not satisfied with the dose he is given, requested his dosage be increased. As example, in January 2003, he was taking Clonazepam (Klonopin is the old brand name) 6 mg a day. The Clonazepam provided to Mr. Angelone had just been raised from 3 mg to 6 mg per day at his request. These are large doses indicating that he must have had a very high tolerance. The upper range of the usual recommended daily dose of Clonazepam is 2 mg. In addition, Mr. Angelone was receiving gabapentin which at the dose he was receiving could also have a strong sedating effect.
>
> There are multiple references in Mr. Angelone's medical records to his physicians being concerned that benzodiazepines and recommended that they should be avoided. An example of this type of entry is as follows: Dr. Furst was aware of Mr. Angelone's history of seeking particular medications particularly benzodiazepines. On 7/23/06, Dr. Furst's note indicates "I am not interested in treating him with benzodiazepines…". He goes on to indicate that "he presumably referring to Mr. Angelone) is reluctant to consider alternatives…" I note that these statements of Dr. Furst regarding Mr. Angelone are consistent with those made by other medical providers. E.R. Reiger, M.D., in his note of 2/2/02 states "Patient also does take one Darvocet and one Soma Compound tablet q.h.s. and we have previously discussed this with the intent of discontinuing eventually both of these." R. Bednarczyk M.D., in his note of 8/25/04 states "Wants Klonapin and narcotic pain relievers. Desire for narcotics and Klonapin.", and R. Waters, M.D., in his note of 9/14/04 which states "Plan: 1. No Benzodiazepines." …

ECF No. 177 (Hegevary Decl.) at 2-3.

In his declaration, Mr. Angelone states that his first visit with Dr. Furst was limited in time and therefore, he had to attempt to relay his life-long treatment history to Dr. Furst in a few minutes. That history includes suffering from PTSD and other anxiety mental disorders starting from when he was around 19 years old. ECF No. 181-1 (Angelone Decl.) at 1-2. Mr. Angelone states that he was put on social security income in 1992 when he was first diagnosed with PTSD and that a psychiatrist at the South Dakota State Penitentiary first prescribed Klonopin for his

anxieties and other health issues in 2001. Mr. Angelone told Dr. Furst that the medication helped him to cope with his issues, kept him from acting out and alleviated symptoms of PTSD. He also told Dr. Furst of the long history of violence he had experienced in his earlier years within the California prison system. *Id.* at 2.

According to Mr. Angelone, he never requested any medicine from Dr. Furst. Dr. Furst prescribed a couple of medicines for him: the first was discontinued because of adverse reactions; the second was a benzodiazepine called "Ativan," which was prescribed for his anxieties because Dr. Furst believed it was "clinically indicated". *Id.* (Angelone Decl.) at 3. Dr. Furst admits that he prescribed "a brief one week treatment course with low dose adjuvant Ativan to Mr. Angelone in April 2006." ECF No. 181-3 (Answer to 2nd Set of Requests for Admissions) at 30.

Mr. Angelone states that he has been prescribed many forms and types of medicine, including narcotics, throughout his life, and he has never abused a drug. He states that he is not a drug seeker, has never sought out a medicine under false pretenses, and has never been arrested for drugs and his prior criminal history is not related to drugs in any way. ECF No. 181-1 (Angelone Decl.) at 3-4.

**DISCUSSION**

To state a claim under 42 U.S.C. § 1983, at least two elements must be met: (1) the defendant must be a person acting under color of state law; and (2) his conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87

(1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 875 (1980). When a plaintiff fails to allege or establish one of the three elements, his complaint must be dismissed. The Civil Rights Act, 42 U.S.C. § 1983, is not merely a "font of tort law." *Parratt*, 451 U.S. at 532. The plaintiff may have suffered harm, even due to another's negligent conduct, but that does not in itself necessarily demonstrate an abridgement of constitutional protections. *Davidson v. Cannon*, 474 U.S. 344 (1986).

As noted above, the sole issue before this Court is whether Dr. Furst is entitled to summary judgment on Mr. Angelone's claim that Dr. Furst retaliated against him for exercising his First Amendment rights. ECF No. 163. The Ninth Circuit has consistently held that prison staff may not retaliate against inmates for exercising their constitutional rights to file lawsuits and grievances. *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1983); *Barnett v. Centoni*, 31 F.3d 813 (9th cir. 1994); *Pratt v. Rowland*, 65 F.3d 802 (9th Cir. 1995); *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005). In order to establish a retaliation claim, an inmate must show that: 1) a state actor took some adverse action against the inmate; 2) because the inmate engaged in constitutionally protected conduct; 3) the adverse action chilled the inmate's exercise of First Amendment rights; and, 4) the adverse action did not reasonably advance a legitimate correctional goal. *Rhodes*, 408 F.3d at 567-68.

A.      **Adverse Action**

Mr. Angelone need not show deliberate indifference on the part of Dr. Furst to hold him liable for retaliation, but he must show retaliatory conduct, *i.e.* "adverse action," by Dr. Furst. *Rhodes*, 408 F.3d at 567 (to succeed in a retaliation claim, plaintiff must demonstrate an adverse action).

According to Mr. Angelone, after he told Dr. Furst that he was going to file a tort claim against him, Dr. Furst became very angry and stated that he "saw where Figueroa prescribed the medicine valium, and that he would see to it that it would be discontinued." ECF No. 181-1 at 4. Dr. Furst denies that his goal in avoiding benzodiazepines had anything to do with Mr. Angelone expressing concerns about his privacy rights. ECF No. 176 at 3-4.

It is not disputed that Dr. Furst told Mr. Figueroa that Mr. Angelone was a benzodiazepine seeker and that he should not be prescribed Valium. Dr. Furst argues that this conduct does not constitute an adverse action because Mr. Angelone had drug-seeking behaviors (specifically with regard to benzodiazepines), other medical providers had previously concluded that benzodiazepines and narcotics were inappropriate, and Dr. Furst recommended a medication with fewer risks as an alternative to Valium. The record confirms that Dr. Furst was concerned about prescribing benzodiazepines and narcotics to Mr. Angelone and that he was not the first doctor to express these types of concerns and to note them in Mr. Angelone's medical records. From these facts, a trier of fact could reasonably infer that Dr. Furst was acting for medical reasons only.

On the other hand, Mr. Angelone's medical records reflect that a neurologist prescribed Soma (a muscle relaxant) and Mr. Angelone's primary care provider prescribed Valium (another muscle relaxant), because it was thought by these medical providers that the medicines might work well in relieving Mr. Angelone's headache pain. *See* ECF No. 103-2 (Figueroa Decl.) at ¶ 7; Exh. 35; ECF No. 93-3, Exh. 5 (Responses to Requests for Admission at 10, ¶ 19). In addition, Mr. Angelone has offered evidence of suspect timing to raise an inference of retaliatory intent.

Within a day of being threatened with a tort claim, Dr. Furst spoke to Mr. Figueroa about the Valium prescription. Although Dr. Furst states that he merely "suggested" to Mr. Figueroa that the Valium prescription be terminated and substituted with baclofen, Mr. Figueroa states quite clearly that "per Defendant Furst's order, [he] could no longer prescribe Valium for Plaintiff on or around September 28, 2006," and that "a conflict may have arisen between Defendant Furst and [himself] had [he] continued prescribing Valium for Plaintiff after Defendant Furst ordered [him] to discontinue prescribing it to Plaintiff…." ECF No. 93-3, Exh. 5 (Responses to Requests for Admission at 10, *Id.*, ¶¶ 22, 24). Mr. Angelone states that because of Dr. Furst's actions, medical providers at SCCC now refrain from prescribing certain medications to him and that he continues to suffer from head pain and anxieties. ECF No. 181-1 (Angelone Decl.) at p. 5.

Based on the foregoing, the undersigned concludes that Mr. Angelone has raised a genuine issue of fact as to whether the actions taken by Dr. Furst in connection with termination of the Valium prescription was an adverse action.

## B. Constitutionally Protected Conduct

The language used by Mr. Angelone in the November 3, 2006 grievance lends credence to his claim that Dr. Furst took the adverse action of discontinuing the Valium prescription because Mr. Angelone continued to complain about the privacy of their meetings and threatened to file a tort claim:

> Dr. Furst prison psychiatrist has and continues to as of 10/13/05 **up until my last appointment 9/28/06** violated my state and federal rights to patent – confidentiality laws. He did this knowingly and will-fully [sic] and with a total disregard to his duties to a patient's interest to privacy. Despite my requests for him to do so and the grievances I submitted ruling in my favor see ID #0524535, level 1 and 2 he not only didn't care, he threatened me each time that if I keep asking for privacy he will continue to deny me the medications Ritalin and

adderal for my ADHD.  He also knows I also suffer from several other mental disorders.  **At my last appointment I told him I was going to file a tort claim on him.  He became angry and said he saw where PA Figueroa prescribed Valium, I'm going to make sure you get off it by telling Figueroa and medical that I was a diazepam seeker.  The medication was discontinued and because of his retaliating against me I continue to suffer from excruciating head pain**.

ECF No. 6-2 at 15 (Grievance, Level I, Log No. 0623466) (emphasis added).  In his declaration, Mr. Angelone states that Dr. Furst threatened to withhold his medication if he did not drop his grievances relating to privacy and became hostile after Mr. Angelone told him he was going to file a tort claim.  "It is at this encounter on or about September 28, 2006 where he became so upset at me and said that 'he saw where Figueroa prescribed the medicine, Valium, and that he would see to it that it would be discontinued."  ECF No. 181-2 (Angelone Decl.), Exh. 1 at 2 (CM/ECF pagination).

Viewing these facts in the light most favorable to Mr. Angelone, the undersigned concludes that Mr. Angelone has raised a genuine issue of material fact as to whether he was engaged in constitutionally protected activity, *i.e.* pursuing grievances and/or a tort claim, when Mr. Furst took the adverse action against him.

## C.    Chilling Effect

Dr. Furst argues that Mr. Angelone cannot show a chilling effect on his ability to file grievances when Mr. Angelone's privacy concerns were entirely resolved.  ECF No. 174 at 21. Dr. Furst also argues that there is nothing more than bare allegations that Dr. Furst had the Valium prescription discontinued "for the sole purpose of retaliating against Mr. Angelone and not because of any valid medical reasons."  *Id.*

In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that "by his actions [the defendant] deterred or chilled [the plaintiff's] political speech

and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir.1994)(citing *Mendocino Env'l Ctr. v. Mendocino County*, 14 F.3d 457, 464 (1994)). This requires only a demonstration that defendants "intended to interfere with [Plaintiff's] First Amendment rights." *Mendocino Env'l Ctr.*, 14 F.3d at 464. Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, the proper inquiry asks "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C.Cir.1996), vacated on other grounds, 520 U.S. 1272 (1997).

"Our cases, in short, are clear that any retribution visited upon a prisoner due to his decision to engage in protected conduct is sufficient to ground a claim of unlawful First Amendment retaliation-whether such detriment 'chills' the plaintiff's exercise of his First Amendment rights or not." See *Rhodes v. Robinson*, 380 F.3d 1183, 1131 (9th Cir.2004). A retaliation claim may be grounded on "an injury no more tangible than a chilling effect on First Amendment rights..." and/or "harms entirely independent from a chilling effect." *Id.*

Mr. Angelone alleges that Dr. Furst violated his First Amendment right to file prison grievances and tort claims when Dr. Furst called him a benzodiazepine seeker and stopped the Valium prescription in retaliation for those grievances and the threat of a tort claim. Mr. Angelone also states that Dr. Furst continues to "campaign" with other SCCC health care providers to keep them from prescribing certain medications to Mr. Angelone despite his continued suffering from head pain and mental anxieties. ECF No. 181-1 (Angelone Decl.) at 5. These facts viewed in the light most favorable to Mr. Angelone, raise a genuine issue of fact as

to whether Dr. Furst's adverse actions have had a chilling effect on Mr. Angelone's First Amendment rights.

### D. Legitimate Correctional Goal

The plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt,* 65 F.3d at 806.  According to Dr. Hegyvary, a physician must not give medications to their patients which are contra indicated and a consulting physician who is aware that his patient is receiving medically inappropriate medication from another healthcare provider is obligated to take action to advise that provider of his concerns.  ECF No. 177 at 2.  Dr. Furst argues, therefore, that by limiting Mr. Angelone's prescription of narcotics and benzodiazepine, which have side effects and dependency issues, he is preserving institutional order and discipline.  ECF No. 174 at 22.

However, when there is a genuine issue of material fact as to whether the adverse action was taken in retaliation for the exercise of a constitutional right, prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process.  *See Bruce*, 351 F.3d at 1289 (internal citations omitted).  Here, the facts viewed in Mr. Angelone's favor give rise to a reasonable inference that Dr. Furst was motivated by retaliatory intent.  If, in fact, Dr. Furst wanted to punish Mr. Angelone because he persisted in pursuing the privacy issues and threatened to (and in fact did) file a tort claim, Dr. Furst cannot assert that his actions served a valid penological purpose, even though Mr. Angelone may arguably have been a benzodiazepine seeker.

Accordingly, the undersigned recommends that Defendant Furst's motion for summary judgment motion on Plaintiff's retaliation claim be denied.

REPORT AND RECOMMENDATION - 21

## CONCLUSION

For the reasons stated above, the undersigned recommends that Defendant Furst's motion for summary judgment (ECF No. 174) be **Denied.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **November 18, 2011,** as noted in the caption.

**DATED** this 24th day of October, 2011.

Karen L. Strombom
United States Magistrate Judge